IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

C CHURCH,                        )
                                 )
                Plaintiff,       )
                                 )
        v.                       )        Case No.
                                 )        11-3528-CV-S-REL-SSA
CAROLYN W. COLVIN, Acting        )
Commissioner of Social Security, )
                                 )
                Defendant.       )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff C Church seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in finding that plaintiff's impairments do not meet Listing 12.05 for mental retardation, in finding that plaintiff's allegations are not credible, and in discounting psychological evaluations. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.    BACKGROUND

On June 16, 2010, plaintiff applied for disability benefits alleging that he had been disabled since July 5, 2006, amended to July 6, 2009. Plaintiff's disability stems from back problems and learning difficulties. Plaintiff's application was denied on September 17, 2010. On July 21, 2011, a hearing was held before an Administrative Law Judge. On August 25, 2011, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On October 28, 2011, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental

2

impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

   Yes = not disabled.
   No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

   No = not disabled.
   Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

   Yes = disabled.
   No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

   No = not disabled.
   Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

   Yes = disabled.
   No = not disabled.

## IV.   THE RECORD

The record consists of the testimony of plaintiff and vocational expert Alissa Smith, in addition to documentary evidence admitted at the hearing.

## A.   ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Order of Dismissal

On November 18, 2009, Administrative Law Judge Peggy Zirlin entered an order of dismissal after plaintiff withdrew his request for administrative hearing in a previous case wherein he had attempted to get disability benefits (Tr. at 49).

### Application for Benefits

In plaintiff's application for disability benefits, he indicated that he had previously filed an application for disability, and that he previously received worker's compensation which ended September 23, 2007 (Tr. at 113).

### Earnings Record

Plaintiff earned the following income from 1984 through 2011, shown in both actual and indexed figures:

| Year | Actual Earnings | Indexed Earnings |
|------|-----------------|------------------|
| 1984 | $ 2,846.36 | $ 6,288.70 |
| 1985 | 14,509.35 | 30,746.74 |
| 1986 | 6,537.59 | 13,454.45 |
| 1987 | 8,290.96 | 16,039.97 |
| 1988 | 9,856.38 | 18,173.42 |
| 1989 | 12,440.04 | 22,063.65 |
| 1990 | 14,344.97 | 24,318.90 |
| 1991 | 11,325.27 | 18,509.85 |
| 1992 | 15,100.61 | 23,470.90 |
| 1993 | 6,107.75 | 9,412.33 |
| 1994 | 13,197.89 | 19,806.98 |
| 1995 | 20,437.62 | 29,490.06 |
| 1996 | 25,185.74 | 34,646.85 |

4

| | | |
|---|---:|---:|
| 1997 | 24,951.12 | 32,431.68 |
| 1998 | 26,070.83 | 32,201.69 |
| 1999 | 39,670.32 | 46,412.76 |
| 2000 | 21,183.49 | 23,485.15 |
| 2001 | 21,063.58 | 22,808.09 |
| 2002 | 14,138.80 | 15,157.78 |
| 2003 | 20,754.22 | 21,719.04 |
| 2004 | 24,162.52 | 24,162.52 |
| 2005 | 36,354.31 | 36,354.31 |
| 2006 | 30,697.09 | 30,697.09 |
| 2007 | 1,399.14 | 1,399.14 |
| 2008 | 0.00 | 0.00 |
| 2009 | 13,135.75 | 13,135.75 |
| 2010 | 0.00 | 0.00 |
| 2011 | 0.00 | 0.00 |

(Tr. at 139-140).

Plaintiff's earnings in 2007 and 2009 were considered unsuccessful work attempts

(Tr. at 173).

**Function Report**

In a Function Report completed on June 24, 2010, plaintiff described his day as

follows: "I get up and shower, eat, etc. I don't do much some days. I may walk the dog to the

end of the block. I drive to check on my mom. Her house is about 1 mile from mine. Most of

the time I just watch TV because it hurts to do most things." (Tr. at 197-204).

Plaintiff has a very hard time going to sleep, and some days he has trouble putting on

socks and raising his left leg to get dressed. He cannot bend to tie his shoes. He has no

difficulty with any other personal care. He does not need reminders to take care of personal

needs, grooming, or to take his medication. When asked about his ability to prepare meals,

plaintiff reported that his wife does the cooking. Sometimes he helps her. "It's not that I

can't, I just don't do it."

Plaintiff goes outside every day. He walks, drives a car, or rides in a car. He is able to

go out alone. He shops in stores for groceries and household items. Plaintiff spends time with

5

others every day, watching television or movies, eating together, or just visiting. He does not have problems getting along with family, friends, neighbors or others.

Plaintiff's condition affects his ability to lift, bend, stand, walk and sit. It does not affect his ability to squat, reach, kneel, climb stairs, remember, complete tasks, concentrate, understand, follow instructions, use his hands, or get along with others. Plaintiff cannot read well, but he can follow spoken instructions "fairly well."

## B.     SUMMARY OF MEDICAL RECORDS

Because the only real issue on appeal deals with whether plaintiff meets the listing for mental retardation, I will only summarize the medical records relevant to that issue. In his brief, plaintiff mentions no medical record dealing with a cognitive or other mental impairment prior to November 18, 2007. That was an exam performed by James N. Butcher, Ph.D., in connection with an application for government benefits.

Dr. Butcher administered the MMPI-2 (Tr. at 298-307). His report includes the following:

> . . . The client may have attempted to present an unrealistically favorable picture of his virtue and moral values. He appears to feel the need to present an image of strong moral character or to deny human frailties. . . .

> . . . This client seems to have a great many vague physical complaints, especially symptoms of tension, insomnia, and stomach distress. Although the present situation may also reflect an exaggerated response to situational stress, his behavior pattern appears to have a long-standing history. In addition, he probably has a history of medical problems, environmental stress such as job or financial troubles, and substance use or abuse difficulties. . . .

> His high score on the Marital Distress Scale suggests that his marital situation is problematic at this time. . . .

> Individuals with this profile often have a long-standing personality disorder, with substance use or abuse as a prominent feature of their clinical pattern. . . .

> Although he may have attempted to present a positive self-report, he endorsed a number of extreme problems on the MMPI-2. His profile pattern indicates an interest in portraying himself as being physically disabled. He reported extensive vague

6

physical problems that are unlikely to be the result of a specific physical disorder. This is most likely the result of a long-term, chronic pattern of somatization that stems from basic ingrained personality problems. He reports being unable to function effectively because of his physical symptoms, which appear to intensify when he faces life conflicts. Individuals with this clinical pattern tend to be uninsightful when it comes to understanding the causes of their symptoms, in part because they prefer to rely on medical explanations for their symptoms. Individuals with this pattern often obtain substantial secondary gain from their symptoms.

NOTE: This MMPI-2 interpretation can serve as a useful source of hypotheses about clients. This report is based on objectively derived scale indices and scale interpretations that have been developed with diverse groups of people. The personality descriptions, inferences, and recommendations contained herein heed to be verified by other sources of clinical information because individual clients may not fully match the prototype. . . .

Dr. Butcher did not test plaintiff's I.Q.

On December 4, 2007, plaintiff saw Raymond Lewandowski, M.D., who diagnosed hypertension, back pain, and depression (Tr. at 310). This appears to be an insurance record, as there is no information about plaintiff's complaints, Dr. Lewandowski's observations or tests, and there is no treatment listed. The insurance information, including the name of his provider, plan code, policy number, group number, and service order code and description are all included along with the simple three-word diagnosis.

On February 5, 2008, John D. Pro, M.D., of Midwest Psychiatric Consultants, P.C., performed a psychiatric evaluation (Tr. at 313-319). Dr. Pro's report includes the following:

. . . I interviewed him for two hours, and interviewed him with his wife for an additional 30 minutes. I also reviewed his records for an hour and a half. . . . I reviewed the following specific records:

| | |
|---|---|
| Dr. Prostic | Ozark Medical Center |
| Dr. Desilva | Dr. Nichols |
| Physical Therapy Specialists | Dr. Scarrow |
| Dr. Lampert | St. John's Radiology |
| Dr. Burton | |

I informed Mr. Church that I would not be providing treatment or a doctor-patient relationship for him. . .

7

HISTORY OF PRESENT ILLNESS: Mr. Church . . . worked for Cummins Tools since approximately 2002. This is a company that set up tool shows for sale. Mr. Church's job was multifaceted and involved driving tools to the sites, loading and unloading the trucks from town to town throughout the country, setting up the displays, and participating in sales. . . . [He] had a diskectomy at L5-S1 on the left side done by Dr. Scarrow on June 19, 2006. His pain improved. He was off work for four weeks, and then returned full duty. . . . Dr. Nichols performed a reoperation for excision of recurrent herniated disc at L5-S1 and a 360-degree fusion on March 30, 2007.

Mr. Church did return to light duty work (sorting light items) after the second surgery in early July 2007 for 10 days. Subsequently, however, he was told he could not work because of his restrictions. He has subsequently been offered several job possibilities at Cummins Tools to accommodate his light duty status, but the offers never have materialized for reasons that are not clear to Mr. Church. He has not received any workers' compensation payments since his surgery in September 2007, and also did not receive workers' compensation payments after his first surgery. . . . Dr. Prostic assigned him light duty work restrictions and a 30% whole person impairment rating based on his orthopedic problems. Dr. Prostic also noted that he has "MMPI evidence of a symptom magnification disorder," and stated, "Unless he can be helped by psychological intervention, he is more probably than not permanently and totally disabled from gainful employment."

. . . He can do some light chores around his house. Currently he and his wife are living with his mother and father-in-law because he could not afford his own house payments or car payments. He avoids getting out socially, and says that part of this is disinterest in being around others, and part of it relates to not having money. . . .

PSYCHOSOCIAL HISTORY: He grew up in an alcoholic, abusive home. His father was an alcoholic and often held his mother at gunpoint, threatening to kill her and himself. His mother, who also drank heavily, took several overdoses when Mr. Church was growing up, and was extremely moody, mean and hostile. . . . His father verbally and physically beat his mother, and once permanently injured one of her eardrums. He recalls often standing in between them, trying to keep them from fighting. Currently, he lives in the same town as his parents, who are still living together, but sees them rarely.

He dropped out of the ninth grade and left home when he was 15 years old. He was poor at reading and spelling. He worked in New Orleans for Chevron Oil Company for several weeks, and then moved to Kansas City, to be with his sister. He then worked in a hardware store. He married his first wife at the age of 16, and they moved to St. Louis, where he did odd jobs. He later worked for a sod company for three years. He also obtained a commercial driver's license at the same time, although he said it took him several tries to get the license. He then worked for a trash company driving a truck for the next three years. He was then divorced in 1998 from his wife, after 17 years of marriage. He stated that they had both married "too young." After the divorce, he moved to southern Missouri in 2001, where he met and married his current wife, (whom he had known during childhood). He initially worked for a trash company in southern Missouri, and then for a heating and cooling company for several

Case 6:11-cv-03528-REL   Document 16   Filed 03/25/13   Page 8 of 40

months before being laid off. Shortly afterwards, he obtained a job at Cummins Tool Company. He has never been fired from a job. . . .

PSYCHIATRIC HISTORY: Mr. Church has a history of episodic alcohol abuse, but stopped about six years ago, after his current wife gave him an ultimatum that he would have to leave if he did not stop drinking. He never went to jail or received a DWI for drinking. He denied any illicit drugs.

Mr. Church also has a history of temper problems. During his 20's, he received several assault charges, which were later reduced to misdemeanors. He assaulted police officers on several different occasions when they were called to their house following fights he and his first wife had. When the police arrived and put a hand on Mr. Church, he became assaultive with them on at least six occasions. He was required to take anger management courses, and did jail time for 30 days, followed by probation. He now has a lifetime "approach with caution" designation to his license. During his school years, he also described several fights with fellow students. Once he threw a desk at his teacher. . .

His primary care physician gave him Celexa about three years ago, when he was having difficulty with depression and anxiety related to his blended family, several deaths in the family, and marital problems.

MEDICAL PROBLEMS: . . . He has been treated for depression and pain with Wellbutrin since his first surgery. He did have a seizure on August 15, 2007. According to his wife, who was with him, his seizure lasted approximately 20 minutes. . . . Since the seizure, she thinks his memory is worse. He was seen by a neurologist, who performed a CT scan and EEG which were normal. . . .

Mr. Church feels that his recent memory has been worse since his second surgery. He drives poorly. He describes his mind as being "full." He tried putting his car in gear when it was not started several weeks ago. He also has become disoriented several times while driving. . . .

. . . In talking with his wife, she felt that he has no ambition. . . . [She] said that he lost his temper more frequently when their kids were younger and the couple was blending their two sets of [eight] children.

MENTAL STATUS EXAM: . . . While reading excerpts from a magazine, he clearly had difficulty with understanding and pronouncing larger words. For example, he did not understand the words "lament" or "agencies" or "habitat" when reading a short excerpt from a popular magazine. Based on the limitations of his vocabulary and reading, and his school history, I estimated his IQ as between 69 and 70 (borderline). . . .

IMPRESSION:
AXIS I:     1.    Major Depressive Disorder, severe, without psychosis, chronic.
            2.    Pain Syndrome with medical and psychological factors.
            3.    History of alcohol abuse.

9

| AXIS II: | 1. | Borderline mental deficiency. |
|----------|-----|-------------------------------|
|          | 2. | Personality Disorder with dependent and explosive traits. |

* * * * *

| AXIS IV: | 1. | Stress of loss of self-esteem, structure and social support from not working. |
|----------|-----|-------------------------------|
|          | 2. | Financial stress. |
|          | 3. | Marital and family stress. |
|          | 4. | Stress of dealing with chronic pain. |
|          | 5. | Stress of dealing with the workers' compensation system. |

| AXIS V: | GAF = 55 (currently) |
|---------|----------------------|
|         | GAF = 55 (highest in past year) |

Dr. Pro stated that plaintiff appeared to be suffering from major depressive disorder and borderline low intelligence. "He feels helpless, has given up, is poorly motivated and catastrophizes about the effects of his injury, because of his low intelligence, his awareness that he is only marketable for manual labor skills, and his dependent personality traits."

> . . . It is also my opinion that within a reasonable degree of medical certainty, it is more likely than not his seizure and memory loss that probably results from his seizure (which lasted 20 minutes by his wife's account,) is related to the Wellbutrin prescribed for the treatment of back pain and depression, induced and aggravated by his 2006 injury at work.

> . . . [H]e has suffered lifelong low intelligence and low reading skills, both of which have restricted his career choices, and have negatively influenced his ability to finish school. . . . I would assign him a 20% "mild" whole-person psychological impairment rating for his preexisting psychological impairment from the combination of impairment arising from his preexisting depression, his personality disorder, his limited intellectual capacity, and his alcohol abuse.

> . . . [F]or the impairment arising from his current depression and pain syndrome, . . . I would rate him at 50% "moderate" whole-person psychological impairment . . . .

> . . . Regarding further treatment, Mr. Church is not at MMI [maximum medical improvement] and needs further treatment. Over the next year, with more aggressive treatment, it is possible that he might improve and return to work with accommodations. His current psychological impairment rating of 50% by itself does not completely preclude working, since "moderate" rating is comparable with "some but not all function," according tot he AMA Guides. However when his psychological rating is combined with his orthopedic impairment rating, it would be difficult for him to compete on the open labor market at this time. . . . He would benefit from treatment

10

by a psychiatrist skilled and experienced in treating patients with chronic pain and depression. . . .

Finally, there is no evidence of malingering, significant secondary gain, deliberate falsification of symptoms or dramatization of his symptoms.

Dr. Pro did not mention plaintiff's intellectual functioning other than in the above-quoted portions of his report. Significantly, he did not list plaintiff's intellectual functioning as an impediment to working.

On September 2, 2008, plaintiff's previous application for disability benefits was denied by SSA (Tr. at 49).

On September 11, 2008, plaintiff was evaluated by Patrick L. Hughes, M.D., of Psychiatric & Family Services of Greater Kansas City, at the request of plaintiff's attorney (Tr. at 322-327). Dr. Hughes examined plaintiff for an hour and reviewed his medical records.

Dr. Scarrow evaluated the patient on July 5, 2006. . . . [T]he patient was exhibiting symptom magnification, non-anatomic exam findings, and expressing pain and disability in excess of objective evidence of ongoing neurological/orthopedic problems.

. . . On August 15, 2007, he presented to the Emergency Room after a spell at home, where he reportedly collapsed, was unconscious and unresponsive, and may or may not have exhibited tonic clonic shaking. The initial concern was a possible Wellbutrin-induced seizure, so that medicine was stopped, but Dr. De Silva's subsequent thorough "epilepsy evaluation" was negative for convincing evidence of a seizure, or determinable cause of same. Rather, she expressed her opinion that his spell was likely a collapse from untreated obstructive sleep apnea; advised treatment with CPAP; but also opined that the patient could not resume commercial truck driving until he had undergone one month of CPAP treatment for his OSA [obstructive sleep apnea]. The records show no evidence so far of Mr. Church undertaking that recommended treatment for his sleep apnea, however.

. . . Dr. Prostic administered a MMPI in October 2007 (which was questionably valid), and the computer generated analysis indicated a strong presence of a "tendency towards somatization" (complaining of physical symptoms masking psychological distress), a significant personality disorder and "elements of depression and anxiety". Dr. Prostic (and subsequently, Dr. Hanson the neurosurgeon) felt the patient had recovered significantly from his orthopedic injury, and could return to gainful employment.

Dr. Pro noted the patient's catastrophically abusive childhood in a home with both alcoholic parents, and with siblings who have subsequently struggled with significant

11

alcohol abuse (as did Mr. Church until he ceased drinking 6 years ago). Dr. Pro noted the patient's report of early self sufficiency, various problems with anger and physical violence, repeated incarcerations for criminal acts, and ongoing problems with "anger management". Though this all is a classic description for a patient with Antisocial Personality Disorder, Dr. Pro instead diagnosed him with a "Personality Disorder with dependent and explosive traits".

Dr. Pro noted the patient's report of serious problems with reading and school work as a youth, his dropping out of school after 9th grade, and the patient's report of being essentially functionally illiterate as an adult in terms of reading, suggesting "Borderline Intellectual Functioning."

. . . Dr. Pro diagnosed "Major Depressive Disorder severe without psychosis", and causally attributed that to his workplace back injury (not the re-injury at home), even though Major Depression is a genetically caused, biochemical disturbance of the brain that is not caused by orthopedic injuries. Neither is "Depression secondary to a general medical condition" attributable to low back injury according to the American Psychiatric Association's Diagnostic and Statistical Manual-IV-TR, which states that in order for that diagnosis to be properly made, the physician "must establish that the mood disturbance is etiologically related to the general medical condition through a physiological mechanism). In keeping with that, DSM-IV-TR lists the "associated general medical conditions" that may cause mood symptoms, and nowhere in that list is included chronic physical pain or lower body orthopedic injuries.

Additionally, Dr. Pro opines that Mr. Church's low back injury aggravated a preexisting personality disorder, an opinion shared by no other psychiatrist that I know, as all personality disorders are (by definition of the American Psychiatric Association) established and permanent at age 18, and one's character structure cannot be changed by later life events or injuries.

Dr. Pro also thought the patient's exaggerated pain complaints constituted a "Pain Syndrome with medical and psychological factors". Dr. Pro opined that Mr. Church's preexisting psychological difficulties were perpetuating his pain complaints, though Mr. Church's Alcohol Dependence had been absent for 6 years; there is no known link between Borderline Intelligence and somatizing pain complaints; somatizing is far less frequent in patient's [sic] with Antisocial Personality Disorders than in the other "Cluster B" personality disorders (histrionic and borderline); and there is not evidence that Mr. Church was experiencing pre-injury Major Depression for numerous years prior to that injury. Further, Dr. Pro opined that the patient's spell in August 2007 was a seizure (an opinion not shared by the neurology specialist), and that it was due to the use of Wellbutrin for depressive symptoms then (also not the opinion of the specialty neurologist, Dr. De Silva). Dr. Pro opined that the patient's subjective memory complaints were the result of brain damage/memory loss from one single seizure, an almost unheard of occurrence from one lone seizure.

For all of the above reasons, I believe that Dr. Pro's psychiatric report is inaccurate, has several frankly incorrect medical constructs in it, and therefore [is] of minimal value to the Court.

PSYCHIATRIC EXAMINATION

Mr. Church arrived early for his appointment, having been driven here by his wife "because I can't ride very long or find my way around well out of town"; he was interviewed individually, however. He presented as a calm, clean and well groomed, casually dressed man in no apparent distress, though he soon voiced multiple complaints and frustrations about "the way my Worker's Compensation case has been handled; it just drags on and on". . . .

. . . [He] expresses significant apprehension and doubt about his ability to "try this new job driving over the road, by myself". His reasons for that concern are both his belief that he is not intellectually capable of following road maps without accompanying drivers, and also his believe that "my pain won't let me ride that long". . . .

Current medical complaints include chronic low back pain "that's like a toothache", and his ongoing fatigue from his Obstructive Sleep Apnea. He tells me that a CPAP machine ordered by the carrier has not yet arrived at his home, "but I absolutely will use it and then go down there and try to get my CDL [commercial driver's license] license; I don't see that I have any other choice." . . . .

Regarding his return to work efforts, he confirms that he has not resumed gainful employment of any sort since his second back injury, but (despite his total conviction that he will be "unable" to resume employment as a commercial truck driver) vows that he'll "try to do it". He rather readily acknowledges that a return to gainful employment and restored ability to provide for his family would provide a definite positive benefit on his current mental state.

OPINIONS

. . . His ASPD [anti-social personality disorder] continues to the present, unchanged (by definition) by his 2006 workplace back injury, so presents no more hindrance now to gainful employment than it did in the many years he worked previously. He reports abstinence from alcohol for the past 6 years, so his Alcohol Dependence presents no psychiatric impairment or hindrance to returning to gainful employment now.

He also has either Borderline Intelligence or else a specific Reading Learning Disorder that has left him functionally illiterate as an adult, which is also unchanged by his 2006 low back injury, and presents no more impairment now than it did in the years that he was working full-time as a commercial truck driver. I also am skeptical that his reports of total inability to read a road map are fully valid, given his lifelong driving of commercial and personal vehicles, and his clear comprehension of verbal directions, etc. . . .

The records seem clear the Mr. Church had an initial substantial recovery from his first back injury and had regained prior employment without any psychiatric distress despite some ongoing back pain, and that his psychiatric distress has only reportedly developed since faced with sustained unemployment after the second injury at home. . . . Accordingly, it's my opinion that he is exhibiting the signs of Adjustment Disorder with mixed features, the prevailing cause of which is his sustained unemployed status

13

since his second back injury at home; moreover, such symptoms should greatly ameliorate or resolve completely  upon his return to gainful employment which this occurs. . . .

. . .  [H]is current exaggerated pain complaints (a <u>Pain Disorder with medical and psychological features</u>) do not represent <u>bonafide</u> psychiatric illness or "injury", but rather only self embraced invalidism and subjective pain complaints for multiple secondary gains. . . .

On January 8, 2009, Dale Halfaker, Ph.D., performed a comprehensive psychological evaluation in connection with plaintiff's State of Kansas Worker's Compensation Claim (Tr. at 350-361, 373-394).

<u>CASE HISTORY AND PRESENTING PROBLEMS</u>:  . . .  He has not returned to work since the time of his second surgery, except for one period of seven days when he worked in a warehouse in Kansas City in July of 2007.  He noted that he has not refused any work that has been offered to him, but he thought there had not been a clear offer of employment made to him. . . .

Currently, Mr. Church reported that he believes he has been released to return to work and has a DOT [Department of Transportation] physical pending.  He believes that if he is able that his employer may ask him to potentially leave on the road on January 15th and be gone through the middle of March.  He is concerned about whether he will be able to sustain the rigors of this work schedule.

. . .  Mr. Church reported that he is very scared about his future and what it may hold because he has limited education, cannot read, and has compensated for his lack of academic preparation by performing physical labor.  He is concerned that if he is unable to do physical labor that he will be forced to rely on disability and public assistance. . . .

Mr. Church reported that he is unable to read or write with any degree of sophistication.  He said he tries to read the newspaper, but typically gets frustrated and cannot understand the stories because there are too many words he does not understand.  He is not able to read street signs with which he is unfamiliar.  On a familiar route, if he knows the names of the streets and roadways he can recognize them and he tends to rely more exclusively on landmarks in navigating directions.

Because of his reading and written expression limitations, if he has to complete job applications he will have his wife complete them for him.  He said he has not ever paid a bill or written a check on his own.  On the job, if he had to read a safety manual or technical materials he would ask supportive coworkers to help him.  He said he tended to learn best by asking people to demonstrate things for him.  He reported shame about his poor reading and writing abilities and that he tended to try to hide them from others.

14

Mr. Church reported that he had limited his employment to situations generally that did not require very much in the way of reading or writing. When he was driving a truck he had to get help in order to complete his log books. He noted that when he was driving for TAP Enterprises that he drove on a crew and there was usually another semi or a private vehicle in a caravan that he followed.

This man thought his academic limitations had held him back occupationally in the past. He said there were jobs he would like to have done, but could not because of his limitations. He gave an example of previously wanting to drive a routine Pepsi route from Willow Springs to Marion, Illinois but he was denied the job once they discovered his limitations. He noted that he would like to have worked in a factory but feared that most employers would require a test of either intelligence or reading in order to be employed.

He said he felt like he had not been able to advance in the jobs he has held in order to be a supervisor because of not being able to complete the paperwork and forms associated with such a position. Now, he remains quite anxious that if he cannot do the kind of work that he is accustomed to doing that there is nothing in the labor market for him. . . .

. . . He did say that if his company were to offer him a position that he would be willing to try it. . . .

Educational Background: He completed school up through his eighth grade year. He said he left school prematurely because he was getting into trouble at school. He relayed that his school spoke to his parents and told them that even though he was not quite yet sixteen since he was "not trying to learn" that if they would sign him out of school that they would allow it. He has not subsequently obtained a high school diploma or its equivalent.

When he was in school, Mr. Church's grades were described as being poor. He reported "football" to be his strongest area and that his academic marks were poor. He thought he received special education assistance beginning when he was in elementary school. By his description of the services he received, it sounded like he was pulled out of the regular curriculum for specialized instruction. He did not fail or repeat any grades.[1]

. . . He said he tended to get into trouble for fighting. He has no further education beyond his formal educational experience. He did not attend a formal school to learn to drive a truck, but said his wife helped him through studying for his CDL. He noted that he had to take the test multiple times and that it had to be read to him. He had a similar experience in obtaining a regular drivers' license as well. . . .

---

[1]This description of his academic career seems internally inconsistent. Plaintiff reported that he did not fail or repeat any grades, but in order to be almost 16 years of age in 8th grade, he would have had to have failed several times.

<u>Legal History</u>:  He reported a history of having been arrested for assault and resisting arrest up to four to five times.  The last episode of that kind of behavior was reported to have been in about 1995.  In those situations, he said that arguments would lead to fights.  He said he had argued with his ex-wife a few times and the police would be called.  He said he had gotten into fights in the community and that he tends to get loud when he is angry.  When he was younger, alcohol would be a factor affecting his behavior.  He noted that he has not used alcohol in the last 18 years. . . .

<u>Substance Use Patterns</u>:  . . .  He noted that he started using alcohol at the age of about 16. . . .  He said his early use of alcohol led to problems such as getting into fights. . . .

<u>Family Background</u>:  . . .  He described his family life growing up as being affected by his parents' alcoholism.  He said his father did not miss work but his parents fought a lot.  He said he had seen his father take a gun and discharge it at the ceiling.  He described his parents as being "hell on wheels."  He thought episodes such as that might have occurred a couple of times per month when he was growing up. . . .  He said his mother tended to be "mean" and that she might "love you one day and hate you the next."  He said he left home at the age of 15 to live with his first wife and her family.  He moved from Willow Springs to New Orleans briefly with his first wife's family and then went to live with family in Kansas City.  He turned 16 years old and he found out that his first wife was back in Willow Springs so he returned there so they could get back together. . . .

<u>Activities of Daily Living</u>:  He is physically independent for the most part in completing his activities of daily living. . . .

<u>Daily Schedule</u>:  Mr. Church indicated that he is usually awakened by 4:00 AM due to pain.  Early in the morning, he may go visit his father.  He will come home and sit in his recliner where he may fall asleep and stay there until later in the afternoon.  During the evening he will sit in his recliner and watch television.  He goes to bed anywhere between 12:00 AM and 5:00 AM depending upon his pain and how he feels.  He said a couple of weeks ago he tried to go to bed at 9:30 PM when his wife does, but when he does, he just lies there, aches, and has too much going through his mind to be able to sleep.

Dr. Halfaker administered the Shipley Institute of Living Scale, the Wechsler Adult Intelligence Scale for Adults - Third Edition, the Wide Range Achievement Test - Third Edition, the Woodcock Johnson Tests of Achievement - Third Edition, and the Minnesota Multiphasic Personality Inventory - Second Edition.  "Due to this man's problems with reading, an audio taped version of the test was utilized and care was taken to ensure that he understood the items."

16

Based upon this information, it is thought that the current testing is valid and interpretable. It is thought potentially that there is some over reporting of subjective symptoms and that such symptoms will need to be evaluated cautiously. . . .

<u>Intellectual Functioning</u>: Initially, the Shipley Institute of Living Scale (SILS) was utilized to estimate Mr. Church's level of intellectual functioning. . . . This administration of the SILS generated an estimated Wechsler standard score of 62. This score is within the Extremely Low range. Due to this low score and the issues related to his historically poor academic functioning and achievement, it was decided to more specifically assess his IQ using a more refined measure, the WAIS-III.

The current WAIS-III results were noted to be within the Extremely Low (69 and below) to Borderline (70-79) range of intellectual efficiency. . . .

WAIS-III IQ Summary:
Verbal IQ            68
Performance IQ       75
Full Scale IQ        69

* * * * *

<u>Retained Academic Achievement</u>: The Wide Range Achievement Test - Third Edition (WRAT-3) Reading subtest . . . resulted in a standard score of 47 that was within the Extremely Low (69 and below) range. It was equivalent to a second grade level of educational development in reading. . . . This also seemed to point to a potential specific learning disorder that was thought to require further more sophisticated evaluation with a more refined measure, the WJ-III. . . .

. . . His level of functioning was observed to range from about the second to third grade level in reading, written expression, and arithmetic skills. These scores suggest that he is barely literate and appear to substantiate his complaints regarding the nature of his subjective complaints of his level of functioning. . . .

Dr. Prostic of the Mid-America Orthopaedic Clinic saw Mr. Church and produced a report that was dated 10/19/2007. It appears that Dr. Prostic is an orthopedic surgeon who administered the MMPI-2 and included the Pearson computerized report as part of his report. . . . This is highly unusual as in my 20 year history as a practicing psychologist I have never seen an orthopedic surgeon administer an MMPI or MMPI-2 as part of the medical evaluation and interpret it him or her self. Additionally, by Mr. Church's report, he said the MMPI-2 was actually read to him by his wife. This is also highly unusual and not standard protocol in a medicolegal matter such as this because it opens the door for potential coaching of the patient by an interested party. . . .

. . . Objectively, Dr. Prostic thought the patient had a good response to the second operation. He opined that the patient's symptoms were out of proportion to the physical and radiological findings. He asserted that there was MMPI evidence of a symptom magnification disorder and thought the patient was unlikely to respond to additional orthopedic treatment. It was strongly recommended that the patient be

17

evaluated by a psychotherapist. Dr. Prostic thought the patient continued to be temporarily totally disabled from gainful employment. . . . He thought that unless the patient could be helped by psychological intervention that he was more probably than not permanently and totally disabled from gainful employment. In a later letter of 11/28/2007, Dr. Prostic provided work restrictions consistent with no lifting of weights greater than 45 pounds occasionally or 20 pounds frequently. He was advised to avoid frequent bending or twisting at the waist, forceful pushing or pulling, more than minimal use of vibrating equipment, and captive positioning.

. . . Dr. Hanson concurred with Dr. Prostic that Mr. Church had both symptom magnification and a somatoform disorder that was unrelated to his alleged work-related impairment.

Dr. Hughes saw this man on 9/11/2008 . . . . He opined that Mr. Church has either borderline intelligence or a specific reading learning disorder that has left him functionally illiterate as an adult. . . .

. . . He opined that this man's current exaggerated pain complaints did not represent bon-a-fide psychiatric illness or injury but rather a self-embraced invalidism and subjective pain complaints for multiple secondary gain.

As of 11/7/2008, Dr. DeSilva indicated the patient had been treated for obstructive sleep apnea with CPAP and oxygen since 5/29/2008 and had been spell free since that time. . . . He was indicated to be complying with the use of the CPAP machine with good control of his apnea. In her opinion, Dr. DeSilva thought Mr. Church was safe to return to commercial driving.

At this point, based upon review of the above noted information, it does appear that this man has been determined to have reached maximum medical improvement and has ben released to return to work with variously described restrictions. . . .

The current testing suggested the presence of Borderline Intellectual Functioning, which as defined by DSM-IV-TR represents IQ scores ranging from 70 to 84. Scores falling into this range are associated with low intellectual ability that is less than Average but not low enough for a diagnosis of Mental Retardation. This classification describes a group that has delayed intellectual, emotional, and/or adaptive functioning that is close to but not actually falling into the range of Mild Mental Retardation. Such individuals function at a higher level than those typically classified as having mental retardation. Their cognitive functioning is nevertheless somewhat limited, creating problems in everyday functioning, judgment, and academic or occupational achievement. As such, individuals with borderline intellectual functioning can be at a disadvantage when entering unfamiliar and stressful situations, but at the same time function well enough to make it difficult to determine definitely that there is a deficit present requiring assistance when they are in a familiar and supportive environment. Their deficits often may remain unnoticed until they encounter demanding and unfamiliar environments where the condition can manifest in poor academic performance, lack of attention to tasks, and behavioral problems, which may stem from frustration and emotional immaturity.

A specific learning disorder did not appear to be present, as Mr. Church's academic achievement functioning was roughly commensurate with his measured level of innate intellectual or cognitive functioning. As such, he does have very real limitations as exhibited by his low grade equivalents that suggest he is marginally literate. This is not thought to be associated with a lack of effort on his part, quitting school prematurely, or cultural deprivation but instead is thought to be due to his impoverished level of cognitive functioning that has habitually been within the borderline range. He is capable of new learning, but will learn at a slow rate and there will be some ultimate limitation associated with the upper range of his learning ability associated with an inability to handle more complex and abstract information and situations. . . .

I also do not believe that this man has antisocial personality disorder. He may have at times engaged in antisocial behavior, but I do not think he truly meets the spirit of what the DSM-IV-TR indicates to be necessary. . . . It is likely that his alcohol abuse was a problem for him in regard to his behavior, irritability, and fights, as it sounded as though he tended to more often get in trouble when he was drinking. . .

When he was successfully working in [the] area of his capability with some support, it appeared that he functioned well enough to make it difficult to determine definitely that there was a deficit present. But now, because of his limitations he tends to respond catastrophically emotionally because he does not see much hope for the future that he is going to be able to support himself and his family at the level to that which he was accustomed. This results in the secondary gain in which he is likely to magnify symptoms and exhibit symptoms that are in excess of expectation because he views himself as having no outlets and believes himself to truly be permanently and totally disabled.

Thus, it appears in part that his Borderline Intellectual Functioning interferes in his ability to rationally evaluate and reasonably understand the nature of his injury, his situation, treatment options, and potential outcomes from treatment. . . .

. . . [I]t is my impression that this patient truly believes that his problems are as severe as they seem to him and he is responding to significant secondary gain associated with his fear that he is unable to do anything else if he cannot do physical labor.

Because of the nature of this man's response to his injury, he is likely to need some supportive psychological counseling to help him see that there may be other jobs that he can do if he cannot return to driving a truck or performing other physical labor. It is true that he likely will need to consider that such jobs may not pay as well as what he was previously doing, but this is part of the adjustment that he needs to make through the counseling process. In order to facilitate this process, it is recommended that he obtain a comprehensive vocational evaluation with a vocational rehabilitation counselor skilled in evaluating such individuals to determine what jobs within the competitive labor market he may qualify for and what the prospects for obtaining such a job and what the availability of such jobs in his local labor market will be. . . .

Mr. Church has a chronic, long standing history of poor cognitive and intellectual functioning. This was found to be consistent with Borderline Intellectual Functioning. . . .

. . . [B]ased upon information currently available to me, I see no psychological reason that Mr. Church cannot make an attempt to return to work, as long as whatever job being proposed for him is within any medically imposed restrictions that he may have been given by any of the evaluating, treating, or consulting physicians. From a practical standpoint in regard to his ability to read and write, it remains my opinion that Mr. Church will like[ly] do better in a crew position rather than driving independently over the road, but this limitation relates to his habitual level of academic functioning, which is very low, ranging from about the second to third grade level in reading, written expression, and arithmetic skills. . . .

. . . [I]t continues to be thought that he will not know whether he will be able to do such a job unless he tries and there does not appear to be any good psychological reason to restrict him from attempting at this time. . . .

DSM-IV-TR DIAGNOSTIC IMPRESSION: . . .

| | |
|---|---|
| Axis I: | Pain Disorder Associated With Both Psychological Factors and a General Medical Condition, Chronic<br>Adjustment Disorder With Mixed Anxiety and Depressed Mood, Chronic |
| Axis II: | Borderline Intellectual Functioning |

* * * * *

| | |
|---|---|
| Axis IV: | . . . Educational problems: Borderline Intellectual Functioning; limited reading, written expression, and arithmetic skills; and no high school diploma or GED. . . |
| Axis V: | GAF: 55 (Current) |

On November 18, 2009, plaintiff's previous disability application was dismissed after he withdrew his request for an administrative hearing. It is unknown from this record when he withdrew his request; however, his earnings record show that he earned $13,135.75 in 2009. He had no earnings in 2010.

On February 25, 2010, plaintiff saw Mary Titterington, a vocational rehabilitation consultant, after having been referred by his attorney (Tr. at 428-440). Plaintiff told Ms. Titterington that he only sleeps about five hours per night and that he does not nap during the

20

day (Tr. at 435). He said he mows his lawn with a riding lawn mower and sometimes it takes him two days to complete the task. Plaintiff reported going to school through 8th or 9th grade, he said he was in special education classes, and his grades were all Is and Fs (the equivalent of Ds and Fs). Plaintiff said he applied for "any jobs that were available" at the Tire Shop, Walnut Mill, and gas station. "Mr. Church is concerned that there are no jobs, which he could perform, given his inability to sit, stand or walk for any length of time, his chronic pain, and his inability to read and write." (Tr. at 436). Ms Titterington determined after testing that plaintiff had reading comprehension level of grade 5.8, i.e., almost a sixth grade reading level. No intelligence test was administered. "Mr. Church is not a good candidate for vocational retraining given his low academic skills, limited intellectual capabilities and his functional limitations. . . . Mr. Church has looked for work but been unable to locate a job. . . . His learning ability is borderline. When all of these factors are combined with his slow manual dexterity his work base is eroded and there are no jobs for him in the open labor market. He is unemployable."

On June 16, 2010, plaintiff filed the instant application for disability benefits.

On August 10, 2010, plaintiff saw Michael Ball, D.O., at the request of Disability Determinations (Tr. at 442-443). He assessed chronic lumbar pain secondary to degenerative joint and disk disease of the lumbar spine, post status lumbar surgery, sleep apnea, hypertension, depression, and obesity. "The patient would not have any difficulty understanding simple instructions. . . . The patient would have no difficulty with sustained concentration and persistence and performing tasks. Patient has no restriction in his ability to interact socially and adapt to various environment[s]."

On September 16, 2010, Kenneth Burstin, Ph.D., completed a mental residual functional capacity assessment (Tr. at 463-465). He found that plaintiff was not significantly

limited in his ability to understand, remember and carry out very short and simple instructions; his ability to maintain attention and concentration for extended periods; his ability to make simple work-related decisions; and in all of the other mental functions on a standard mental residual functional capacity assessment with the exception of two "moderately limited" findings: His ability to understand and remember detailed instructions, and his ability to carry out detailed instructions.

On May 18, 2011, plaintiff saw Donald E. McGehee, Ed.D., in connection with plaintiff's application for medical assistance (Tr. at 477-479). The second page of his four-page report appears to be missing from the record. Plaintiff was obese at 270 pounds, he was disheveled and generally exhibited poor personal hygiene. He had a three- to four-day growth of beard. He appeared to be experiencing a severely depressed mood. His speech was neither relevant nor goal directed, he needed confirmation from his wife on most of his responses to questions. "[H]e appeared to function in the range of mild mental retardation to borderline level of intelligence." Plaintiff "tends to have a variety of somatic complaints. . . These complaints include insomnia, headaches, nausea, cold sweats, undue perspiration, clammy hands, and palpitations. The intensity of these symptoms appears to be experienced by him as quite severe and disabling." Although the missing page of Dr. McGehee's report appears to be the one which identifies the testing, he states on page 3: "Test results are consistent with a dependent personality disorder, but he is extremely passive-aggressive and self-defeating in nature. His clinical profile is significant for bipolar disorder with the accompanying depression, anxiety, and somatic concerns. . . . Based on this evaluation, he meets the criteria for medical assistance." Dr. McGehee assessed biopolar disorder and dependent personality disorder.

On July 18, 2011, Dr. McGehee completed a Medical Source Statement Mental (Tr. at 485-487). He found that plaintiff is moderately limited in his ability to understand and remember very short and simple instructions, but he is not significantly limited in his ability to carry out very short and simple instructions. He found that plaintiff is moderately limited in his ability to maintain attention and concentration for extended periods.

## C. SUMMARY OF TESTIMONY

During the July 21, 2011, hearing, plaintiff testified; and Alissa Smith, a vocational expert, testified at the request of the ALJ. During the hearing plaintiff amended his alleged onset date from July 5, 2006, to July 6, 2009, which was the last day he worked (Tr. at 29).

### 1. Plaintiff's testimony.

Plaintiff was 43 years of age at the hearing and is now 45 (Tr. at 30). He is married, and his wife is self-employed (Tr. at 30). Two of his children, ages 18 and 19, live at home (Tr. at 30-31).

Plaintiff is 5'9" tall and weighs 270 pounds (Tr. at 32). He has an 8th grade education (Tr. at 31). Plaintiff cannot read or write very well (Tr. at 31). Plaintiff's wife read the Social Security notices to him when they came in the mail (Tr. at 31).

Plaintiff worked up until around July 6, 2009 (Tr. at 32). He was driving a truck for Tap Enterprise (Tr. at 33). He would drive a truck, following people down the road, and then they would set up tool sales (Tr. at 33). He did this for six or seven years (Tr. at 33). He was required to lift 100 pounds or more (Tr. at 33). Plaintiff had to go to the emergency room in Colorado, and when he tried to get back in touch with his employer he was told the position was no longer needed[2] (Tr. at 40).

---

[2]Plaintiff's testimony on this issue was confusing. After he testified that his employer told him the position was no longer needed, the ALJ asked "And when you went back to work and tried, do you know about how long you actually were there?" He answered, "Oh, three/four

23

Before working for Tap Enterprise, plaintiff drove a trash truck (Tr. at 33). He was required to lift 100 pounds or more (Tr. at 33). He did this job for about five years (Tr. at 33).

The job before that was working on a sod farm (Tr. at 33). Plaintiff drove a tractor and helped lay sod (Tr. at 34). He had to lift at least 50 pounds (Tr. at 34). He did that job for about seven years (Tr. at 34).

Plaintiff can no longer do those jobs because he cannot bend like he did before, he cannot lift, he cannot sit or stand for a long period of time (Tr. at 34). He has a pulling sensation down the back of his leg because of his back injury (Tr. at 34). Plaintiff has a throbbing and pulling sensation, and it has been there for a long time (Tr. at 35). He has burning pain that radiates down his left leg (Tr. at 35). Despite the procedures plaintiff has had, he continues to have pain (Tr. at 35). On a daily basis, plaintiff's pain averages a 6 out of 10 (Tr. at 35). At its worst, it is a 7 or 8 out of 10 (Tr. at 35). Plaintiff's pain is that bad about three days a week (Tr. at 36). To alleviate pain, plaintiff uses a TENS unit and he sits in a recliner, lies in bed, or gets in the bathtub (Tr. at 36). Most of the day plaintiff spends reclining or lying down (Tr. at 36). He may lie down for 30 minutes, then get up and walk around (Tr. at 36). When he uses a TENS unit, that takes 40 minutes to an hour (Tr. at 36). He uses it about five times a day (Tr. at 36-37). His doctor has talked about putting a TENS unit inside his back (Tr. at 40). No doctor has recommended that plaintiff use a cane or walker (Tr. at 41).

Plaintiff can stand in one position for 20 to 30 minutes at a time (Tr. at 37). He can walk for 5 to 15 minutes -- perhaps a little longer (Tr. at 37). He can sit for 30 minutes before needing to change positions (Tr. at 37). Plaintiff can lift about nine pounds (Tr. at 37).

_____

months." (Tr. at 41).

24

Plaintiff does not like being around people anymore (Tr. at 38). When he is in pain, he does not want to be around anyone (Tr. at 38). Psychologically, plaintiff has about three good days a week (Tr. at 39). On a typical day, he has no energy at all (Tr. at 39).

Plaintiff tries to help his wife cook (Tr. at 39). He dusts a little with a feather duster (Tr. at 39). Plaintiff is able to drive into town, but if they go on a trip his wife will drive (Tr. at 40). Plaintiff does no yard work -- his sons do the mowing (Tr. at 41).

## 2. Vocational expert testimony.

Vocational expert Alissa Smith testified at the request of the Administrative Law Judge. The first hypothetical involved a person limited to sedentary work which does not involve concentrated exposure to vibrations or hazardous conditions and the person is also limited to simple work (Tr. at 43). The vocational expert testified that such a person could work as an optical good lens inserter, DOT 713.687-026, with 1,575 jobs in the state and 10,000 in the country (Tr. at 43). The person could work as a dowel inspector, DOT 669.687-014, with 430 jobs in Missouri and 16,500 in the country (Tr. at 43). The person could work as a pharmaceutical processor, DOT 559.687-034, with 630 jobs in Missouri and 27,350 in the country (Tr. at 43). If the person had to be able to change positions from sitting to standing every 30 minutes, those three jobs could still be performed (Tr. at 43).

The next hypothetical involved a person who must lie down most of the day (Tr. at 44). The vocational expert testified that such a person could not work (Tr. at 44).

The next hypothetical involved a person who would be off task due to pain or psychological interruptions -- the vocational expert testified that if the person were off task 15% of the time or more, he would be unemployable (Tr. at 44).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Robert Burbank entered his opinion on August 25, 2011 (Tr. at 10-20).  He found that plaintiff's last insured date is March 31, 2013 (Tr. at 12).

Step one.  Plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 12).

Step two.  Plaintiff suffers from the following severe impairments:  status post laminectomy and borderline intellectual functioning (Tr. at 12).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 13).

Step four.  Plaintiff retains the residual functional capacity to perform less than the full range of sedentary work.  He is limited to occupations that allow him to change positions from sitting to standing up every 30 minutes.  He must avoid concentrated exposure to vibrations and hazardous conditions.  He is limited to occupations that require the performance of simple work only (Tr. at 14).  With this residual functional capacity, plaintiff cannot perform his past relevant work (Tr. at 18).

Step five.  Plaintiff can work as an optical goods lens inserter, a dowel inspector, or a pharmaceutical processor, all available in significant numbers (Tr. at 19).

## VI.    CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.  Specifically plaintiff takes issue with the ALJ's reliance on statements by examining doctors that plaintiff engaged in symptom magnification.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a

whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

The claimant alleges disability due, in part, to "back problems from [a] work injury" and "learning problems." The claimant has stated that he cannot bend and cannot raise his leg "very high." The claimant has stated that on a typical day, he "[does not] do much." However, he has stated that he often walks his dog and drives to his mother's house. The claimant has indicated that he cannot "lift, bend, walk, [or] stand for long periods." The claimant has also indicated that he cannot read very well and that he sometimes requires someone to explain things to him. However, he has also stated that he follows spoken instructions "fairly well." The claimant has stated that his impairments cause difficulties in the following areas of functioning: lifting, bending, standing, walking, and sitting.

The record indicates that the claimant attributes his back problems to work related injuries. The claimant has stated the back problems occurred as a result of his job duties, which included repetitious, heavy lifting. The claimant has indicated that the work injuries occurred over the course of several months in 2006. Subsequent treatment records show that the claimant presented for treatment with complaints of constant low back pain. The claimant also sometimes reported radiation of the pain into his left lower left extremity, although on other occasions he denied radiation of pain.

* * * * *

As noted, the claimant also alleges disability due to "learning problems." The claimant testified that he cannot read or write very well. Multiple examining professionals have diagnosed the claimant with borderline intellectual functioning. As a result, the undersigned has included a limitation of "simple work only" in the claimant's residual functional capacity.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible.

The objective evidence supports a finding that the claimant can perform at least sedentary exertional level work. As noted, Dr. Ball determined that the claimant can lift at least 10 pounds. In addition, diagnostic imaging and results upon physical examination have been largely benign or at least inconsistent. For instance, the claimant has demonstrated lumbar tenderness and some straight leg raising tests have been positive. However, straight leg raising tests have been negative on multiple other occasions. Moreover, the claimant's strength in his upper and lower extremities has been described as normal. The claimant has also given inconsistent statements about his symptoms, which has a negative impact on his credibility. For example, the claimant has reported radiation of pain on some occasions, but specifically denied radiation of pain at the June 2011 examination. The inconsistencies in results on physical exams may he attributable to exaggeration of symptoms. The record contains multiple entries indicating that the claimant engages in "symptom magnification". One entry states that the claimant has "an interest in portraying himself as being physically disabled".

28

The claimant has also described daily activities that are not limited to the extent one would expect given his complaints of disabling symptoms and limitations. As noted, the claimant has stated that he is generally able to cook, go shopping, watch television and movies, and take care of the majority or his personal needs. The claimant has also stated that he takes care of his dog and drives to his mother's house every day to check on her. The claimant testified that he can only sit for 30 minutes at a time. However, in February of 2010, the claimant drove himself from his home to an appointment in Prairie Village, Kansas (a Kansas City suburb), which is a considerable distance.

In terms of treatment, the record reveals relatively infrequent trips for treatment for the allegedly disabling symptoms. The claimant's lack of treatment is at odds with the gravity of his complaints. Moreover, the record indicates that the claimant has had some success in controlling his pain with certain types of treatment. For instance, during one examination it was noted that the claimant derived "excellent relief from epidural injections".

(Tr. at 15-17).

Contrary to plaintiff's suggestion, the ALJ did not simply rely on the statements by doctors that plaintiff engaged in symptom magnification and that he had an interest in portraying himself as physically disabled. The ALJ examined the appropriate credibility factors before making his finding.

The record shows that plaintiff saw Dr. Horstman on June 24, 2011, and "brought in paperwork for Dr. Horstman to sign for disability for the lawyer." The record states that plaintiff "feels well with minor complaints" and indicated, "I am not sure what is wrong with me." Plaintiff's wife said plaintiff does not do anything.

Plaintiff was able to cook, shop, watch television and movies, care for his dogs, and drive to his mother's house every day to check on her. He could take care of most of his own personal needs. Activities that are inconsistent with a claimant's assertion of disability reflect negatively upon the claimant's credibility. Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001).

The ALJ noted that plaintiff had given inconsistent statements about his symptoms, which negatively impacts his credibility. For example, plaintiff testified that he could sit for

only 30 minutes at a time, but the ALJ noted that he was able to drive from his home to an appointment in the Kansas City area, a considerable distance. The ALJ noted evidence throughout the record suggesting that plaintiff exaggerated his symptoms. Dr. Prostic indicated a strong presence of a tendency towards somatization. Dr. Hughes did not believe plaintiff's allegations that he cannot read a map. Dr. Halfaker noted over-reporting of subjective symptoms. He indicated that plaintiff magnifies symptoms for secondary gain due to his fear that he cannot do physical labor -- but Dr. Halfaker indicated plaintiff may be able to do other jobs that pay less than plaintiff is used to earning. Dr. Hanson noted symptom magnification and somatoform disorder. Dr. Hughes noted exaggerated pain complaints, self-embraced invalidism, and subjective pain complaints for multiple secondary gain. Dr. Butcher noted that plaintiff attempted to present an unrealistically favorable presentation of his virtue and moral values. Dr. Scarrow noted that plaintiff was expressing pain and disability in excess of objective evidence. Dr. McGehee noted a variety of somatic complaints.

In his Function Report, plaintiff indicated that his condition does not affect his ability to concentrate, complete tasks, remember, understand, or follow directions. Despite that report, he told multiple doctors who examined him for government benefits that he had a poor memory.

Plaintiff told Dr. Pro that he did not receive worker's compensation benefits, but his application for disability benefits indicates that he did. Plaintiff told Dr. Hughes he had stopped drinking six years before his exam (or 2002), and he told Dr. Halfaker that he had stopped 18 years earlier, or in 1991.

The ALJ noted that plaintiff had sporadic treatment for his allegedly disabling symptoms. Most of the medical evidence of record consists not of treatment records, but of consultative evaluations made in plaintiff's worker's compensation case, and it pre-dates the

relevant period of consideration. During the entire period after plaintiff's alleged onset date, he sought medical treatment only four times. He saw Dr. Lampert once (in August 2009) for pain medication. More than a year later, in October 2010, he first established care with his primary care physician, Dr. Horstman. He saw Dr. Horstman again in November 2010 to have his blood pressure checked. He next saw Dr. Horstman more than seven months later, in June 2011, and less than a month before his administrative hearing, asking Dr. Horstman to complete disability paperwork and requesting a general check-up, as he was not sure what was wrong. Dr. Horstman noted that plaintiff had only "minor complaints." The fact that plaintiff sought minimal medical treatment suggests that his symptoms were not as bad as he claims and is a proper factor for consideration in the credibility assessment. Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) ("[Claimant's] failure to seek medical assistance for her alleged physical and mental impairments contradicts her subjective complaints of disabling conditions and supports the ALJ's decision to deny benefits.").

The record establishes that plaintiff believes he can only do the same type of work he had done before, i.e., driving a truck or other heavy manual work. He told Dr. Hughes he had no choice but to use a CPAP and try to get his CDL back. Plaintiff told Dr. Pro that he can only do manual labor jobs. He told Dr. Halfaker that he can only do physical labor and that if he cannot return to driving a truck, there is no other job he can do. He said he would like to work in a factory but feared it would require reading or an intelligence test, which indicates plaintiff never attempted to get such a job as he was still speculating about what the hiring process would require. Plaintiff has clearly never seriously considered any other type of job, including the kind of jobs the ALJ found he could perform.

Finally, I note that plaintiff expressed a willingness to do a job, which suggests that he was unable to find a job, not that he was unable to perform a job. For example, he told Dr.

Hughes he was not able to work, but he also said that he would "try to" do a job if it were offered to him. He told Dr. Halfaker that if his company would offer him a job, he would try it. He told Ms. Titterington in 2010 that he had applied for a lot of jobs. This is inconsistent with a belief in total disability.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's subjective allegations of disabling symptoms is not entirely credible.

## VII. *LISTING 12.05*

Plaintiff argues that the ALJ erred in finding at step three of the sequential analysis that plaintiff's impairments do not meet or equal the requirements of Listing 12.05c.

The Eighth Circuit has interpreted Listing 12.05c -- mental retardation -- to require a claimant to show each of the following three elements: "(1) a valid verbal, performance, or full scale IQ score of 60 through 70, (2) an onset of the impairment before age 22, and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function." McNamara v. Astrue, 590 F.3d 607, 610-611 (8th Cir. 2010), quoting Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006).

The ALJ's analysis of whether plaintiff met this Listing includes the following:

The claimant's mental impairment has been considered under the requirements of listing 12.05 *Mental Retardation*. Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in paragraphs A, B, C, or D are satisfied.

The requirements in paragraph A are met when there is mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting. eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded. In this case, these requirements are not met. The claimant has stated that, apart from occasional difficulty putting on socks because

32

of unrelated back pain, he does not have problems performing any of his personal needs.

Turning to the requirements in paragraph B, they are not met because the record does not contain evidence of a valid verbal, performance or full scale IQ of 59 or less.

In terms of the requirements in paragraph C, they are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. The record does show that the claimant has achieved IQ scores in the 60's. However, the record does not contain evidence of another physical or other mental impairment that imposes additional and significant work-related limitations of function. In fact, the claimant worked successfully for a number of years.

Finally, the requirements in paragraph D are met if the claimant has a valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

In activities of daily living, the claimant has mild restrictions. The claimant has stated that he is able to walk his dog, visit his mother, take care of his personal needs, cook, go shopping, and drive a car. Thus, the undersigned finds that the claimant has mild limitations in the area of activities of daily living.

In social functioning, the claimant has mild difficulties. The claimant has stated that he spends time with others. The claimant has indicated that he visits, eats meals, and watches movies with other people. In addition, he has stated that he gets along "fine" with authority figures. As a result, the undersigned finds that the claimant is mildly limited in the area of social functioning.

With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant has reported that he sometimes has memory problems and difficulty understanding directions. However, he has also indicated that he watches a large amount of television and can follow spoken instructions "fairly well." On balance, the undersigned finds that the claimant has moderate limitations in the area of concentration, persistence or pace.

As for episodes of decompensation, the claimant has experienced no episodes of decompensation which have been of extended duration.

Accordingly, the requirements in paragraph D are not satisfied.

(Tr. at 13-14).

Case 6:11-cv-03528-REL   Document 16   Filed 03/25/13   Page 33 of 40

*A Valid Verbal, Performance, or Full Scale IQ Score of 60 Through 70.*

The ALJ pointed out that, "The record does show that the claimant has achieved IQ scores in the 60's." The ALJ did not analyze whether the IQ scores were valid, but I will assume that to be the case.

*A Physical or Other Mental Impairment Imposing an Additional and Significant Work-related Limitation of Function.*

The ALJ found that, "the record does not contain evidence of another physical or other mental impairment that imposes additional and significant work-related limitations of function. In fact, the claimant worked successfully for a number of years." However, the ability to work in semi-skilled and unskilled jobs for many years is "not relevant if [the claimant] otherwise meets the requirements of Listing 12.05. It is relevant, however, to whether she has shown the deficits in adaptive functioning necessary to meet that listing." Cheatum v. Astrue, 388 Fed. Appx. 574 n. 5 (8th Cir. (Mo) July 30, 2010), citing Maresh v. Barnhart, 438 F.3d 897, 901 (8th Cir. 2006).

In Sird v. Chater, 105 F.3d 401, 403 (8th Cir. 1997), the court held that an adverse finding at step four of the analysis ipso facto establishes the third prong of the 12.05c Listing:

> The issue is . . . whether he has a physical impairment, other than his conceded mental impairment, which provides significant work-related limited function -- in other words, whether the second prong of § 12.05(C) is met.
>
> Our court originally reviewed this issue in Cook v. Bowen, 797 F.2d 687 (8th Cir. 1986). There, we held that the second prong of § 12.05(C) is met when the claimant has a physical or additional mental impairment that has a "more than slight or minimal" effect on his ability to perform work. Id. at 690. In Warren v. Shalala, 29 F.3d 1287 (8th Cir. 1994), we reaffirmed that test, relying in part on a Fourth Circuit opinion which held that to be "significant" the functional limitation under § 12.05(C) "need not be disabling in and of itself." Branham v. Heckler, 775 F.2d 1271, 1273 (4th Cir. 1985). As the Branham court reasoned, "If the plaintiff's physical impairment were required to be independently disabling, section 12.05(C) would be rendered meaningless. Therefore, something less than a preclusion from any substantial gainful employment must apply." Id.

34

The Branham court went on to hold that if a claimant cannot perform his past relevant work, he "experiences a significant work related limitation of function" and meets the second prong of § 12.05(C). Id. We think this conclusion is ineluctable.

In this case, because the ALJ found that plaintiff could not perform his past relevant work, he likewise found that plaintiff has a "physical or other mental impairment imposing an additional and significant work-related limitation of function."

However, even though the ALJ was incorrect in his finding on that prong of the Listing analysis, I find that the result is the same because the evidence does not support a finding that plaintiff suffered a deficit in adaptive functioning prior to age 22.

_An Onset of the Impairment Before Age 22._

Plaintiff argues that, "The ALJ concluded that Church did not satisfy 12.05(C). The ALJ did not discuss whether Church's deficit in adaptive functioning manifested before age 22. The ALJ likely conceded this point, but if not, that Church's deficit in adaptive functioning manifested before age 22 is well supported by the record." Plaintiff did not discuss this prong any further. I disagree that the ALJ "likely conceded" that this prong had been met, and I also disagree that the fact is well supported by the record.

Although the Acting Commissioner argues that a diagnosis of "mental retardation" does not appear in the record (instead, plaintiff was diagnosed with only borderline intellectual functioning), a formal diagnosis of mental retardation is not required. Christner v. Astrue, 490 F.3d 790, 793 (8th Cir. 2007) (ALJ erred in giving any credence to the lack of a diagnosed mental deficiency); Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006) (Listing does not require a formal diagnosis of mental retardation).

20 C.F.R. pt. 404, subpt. P, app 1, § 112.00C(10) provides as follows:

IQ test results must also be sufficiently current for accurate assessment under 112.05. Generally, the results of IQ tests tend to stabilize by the age of 16. Therefore, IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior.

Therefore, it is clear that the law does not require proof of an IQ test prior to age 22 in order for a claimant to satisfy Listing 12.05c.

However, an ALJ is not required to accept a claimant's IQ scores and may reject scores that are inconsistent with the record. Miles v. Barnhart, 374 F.3d 694, 699 (8th Cir. 2004).

> The listing for mental retardation, Listing 12.05, 20 C.F.R. Pt. 404, Subpt. P., App. 1 (2001), describes mental retardation as, "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." . . . We have emphasized in the past that IQ scores must be valid, that the Commissioner need not rely exclusively on IQ scores, and that the Commissioner may disregard test scores that are inconsistent with an applicant's demonstrated activities and abilities as reflected in the record as a whole. Muncy v. Apfel, 247 F.3d 728, 733 (8th Cir. 2001); Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998).

Clay v. Barnhart, 417 F.3d 922, 928-929 (8th Cir. 2005). See also Christner v Astrue, 498 F.3d 790, 793-794 (8th Cir. 2007) ("[a]n ALJ may disregard a claimant's IQ score when it is derived from a one-time examination by a non-treating psychologist, particularly if the score is inconsistent with the claimant's daily activities and behavior." quoting Muncy v. Apfel, 247 F.3d 728,733 (8th Cir. 2001)); Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998).

In Johnson v. Astrue, 627 F.3d 316, 319-320 (8th Cir. 2010), the claimant had a performance IQ of 69, but he graduated in the top half of his class with As and Bs, and his daily activities and answers and abilities during his psychological tests were inconsistent with his IQ score.

In Cheatum v. Astrue, 388 Fed. Appx. 574 (8th Cir. (Mo) July 30, 2010), the claimant was able to work in semi-skilled and unskilled jobs for many years, perform activities of daily living, and drive. These factors are relevant as to whether the claimant had shown "deficits in adaptive functioning before age 22." Likewise, in Hines v. Apfel, 317 Fed. Appx. 579 (8th Cir. (Mo) March 25, 2009), the court noted that the claimant had performed semi-skilled work and had not sought treatment for cognitive deficits, nothing in the claimant's medical

36

records indicated a suspicion of mental retardation, and the claimant's demeanor at the hearing were all inconsistent with the claimant's low IQ scores. In Clay v. Barnhart, 417 F.3d 922 (8th Cir. 2005), the court noted that the claimant had poor performance and an early exit from school, but there was no treatment record, diagnosis, or even inquiry into a mental impairment prior to the claimant applying for benefits which "weighs against a finding of an impairment."

Conversely, in Douglas v. Astrue, 341 Fed. Appx. 257 (8th Cir. (Ar) July 9, 2009), the ALJ's finding that the claimant's low IQ scores were inconsistent with the record was reversed by the court. Although the ALJ had found that the claimant performed a semi-skilled job, the court found that the claimant had only been a "gopher" which was not semi-skilled work. In Christner v Astrue, 498 F.3d 790, 793 (8th Cir. 2007), the claimant dropped out of school in a low grade and after having been in special education classes. The court found that the claimant "likely met his burden of establishing onset before age twenty-two" because he had been unable to read or write, he had been unable to live independently, he was unable to keep jobs because he was slow, and he had a limited work history as a result. In Maresh v. Barnhart, 438 F.3d 897 (8th Cir. 2006), the court found that the claimant had established deficits in adaptive functioning before age 22 because the record showed he struggled in special education, dropped out in the 9th grade, had trouble with reading, writing and math, got into frequent fights with other children, and his employment history consisted of only a couple weeks of employment after which he was terminated.

In this case, the record establishes that plaintiff was able to perform a semi-skilled job and several unskilled jobs over many years. Being able to work in semi-skilled and unskilled jobs for many years, perform activities of daily living, and drive was held to be inconsistent with the Listing in Cheatum v. Astrue, supra.

Although plaintiff dropped out of school at a young age and (by way of his testimony only) it was established that he was in special education and got low grades, the evidence suggests that he left school for reasons other than fighting as was the case in Maresh. The record establishes that plaintiff's home life was not good, his parents were violent with each other, and plaintiff's mother was mean to him. He left home at the age of 15 (which is the age he claims to have dropped out of school) to live with his first wife and her family. He moved from Willow Springs to New Orleans briefly with his first wife's family and then went to live with family in Kansas City. He turned 16 years old and he found out that his first wife was back in Willow Springs so he returned there so they could get back together. This suggests that plaintiff left school because he wanted to leave his troubled family situation and went where he could find both a place to live and a way to take care of himself financially. Furthermore, plaintiff's fighting at school and his onset of drinking alcohol occurred at the same time and it is undisputed that alcohol caused assaultive behavior by plaintiff, suggesting that his fighting in school was not the result of a cognitive impairment.

Here, as in Hines v. Apfel, supra, plaintiff performed semi-skilled work, he did not seek treatment for cognitive deficits, and nothing in his medical records indicated a suspicion of mental retardation -- all inconsistent with the claimant's low IQ score. As in Clay v. Barnhart, supra, plaintiff had poor performance and an early exit from school, but there was no treatment record, diagnosis, or even inquiry into a mental impairment prior to the claimant applying for benefits which weighs against a finding of a Listed impairment.

Dr. Pro noted plaintiff's "early self-sufficiency" in getting married at the age of 16 and working to support his new family. Plaintiff's ability to work for a living, both as a teenager and as an adult, for many years, in both unskilled and semi-skilled jobs, coupled with his

ability to drive, take care of himself and shop -- according to Eighth Circuit case law -- preclude a finding that he has met this prong of the inquiry.

## VIII.    PSYCHOLOGICAL EVALUATIONS

Plaintiff argues that the ALJ erred in analyzing the psychological evaluations.  This argument is without merit.

In this case, the ALJ was faced with the unusual situation of multiple doctors criticizing the findings, testing, and methods of the others.  The doctors all performed tests and rendered opinions in connection with plaintiff's various attempts to secure benefits of one form or another.  Nearly all of the reports were generated before plaintiff's alleged onset date.  The opinions in the reports were based on the requirements of obtaining worker's compensation benefits or obtaining medical assistance, not in connection with Social Security disability law.

After reviewing the medical records summarized above, I find that the substantial evidence in the record supports the ALJ's residual functional capacity assessment.  His opinion discusses the medical evidence and gives sufficient reasons for discrediting portions of the various doctors' opinions.  For example, Dr. McGehee only saw plaintiff on one occasion and that exam was done in connection with plaintiff's application for benefits under a State of Missouri program.  I also note that plaintiff's presentation, demeanor, and subjective complaints during that exam were markedly different than in all of his other exams, and Dr. McGehee noted that plaintiff continually turned to his wife each time he was asked a question.  Further, Dr. McGehee actually found that  plaintiff is not significantly limited in his ability to carry out very short and simple instructions, which is consistent with the ALJ's residual functional capacity assessment.  Likewise, Dr. Ball found that plaintiff can perform simple tasks; Dr. Burstin found that plaintiff could perform simple tasks.

IX.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
March 25, 2013